UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


LYNDA MACHALETTE,

      Plaintiff,

v.                                  Case No.  8:10-cv-600-T-30TGW

SOUTHERN-OWNERS INSURANCE
COMPANY,

      Defendant.

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Southern-Owners Insurance Company's Motion for Summary Judgment (Dkt. 33), Plaintiff Lynda Machalette's Response in opposition (Dkt. 38), and Defendant Southern-Owners Insurance Company's Reply (Dkt. 41). The Court, having considered the motion, response, reply, record evidence, and being otherwise advised in the premises, concludes that the motion should be granted and final summary judgment should be entered in favor of Defendant.

## BACKGROUND

This is a bad-faith insurance claim arising from an automobile accident between Plaintiff Lynda Machalette, the insured of Defendant Southern-Owners Insurance Company's ("Southern-Owners"), and Robert Olivio, the third-party claimant. Machalette's policy with Southern-Owners included a bodily injury limit of $100,000, per person. On January 18, 2007, Machalette's husband contacted Southern-Owners to report the accident, which had

occurred that same day between his wife and Mr. Olivio. Mr. Machalette informed Southern-Owners that Mr. Olivio's injuries were pretty serious and that Mr. Olivio had been transported to the hospital by EMS. Mr. Machalette also stated that he and his wife were anxious to get the case settled. Mr. Machalette was not in the automobile with Mrs. Machalette during the accident and was not a witness to the accident.

On January 19, 2007, Silvia Salvatierra, the Southern-Owners' claims representative assigned to Machalette's case, contacted Machalette for the first time. On that same day, Salvatierra also requested a police report from the Florida Highway Patrol. Salvatierra also contacted the Olivios for the first time and left a message on their voice mail with her contact information.

On January 23, 2007, Salvatierra talked to a State Farm Insurance representative, Mr. Olivio's automobile insurance agency, who informed her that Mr. Olivio had personal injury protection ("PIP") coverage with State Farm in the amount of $10,000. That same day, Mrs. Olivio contacted Salvatierra and stated that her husband was in the hospital with a leg injury and that he would probably need some reconstructive surgery. According to Mrs. Olivio, she told Salvatierra during this conversation that Mr. Olivio would not be able to come home any time soon and that her husband had already undergone surgery and an external fixator was in place as a result of the accident. She also informed Salvatierra that his leg would need future reconstructive surgery.

Mrs. Olivio stated during her deposition that she was upset during the phone call because she did not know if her husband's medical bills would be $5,000 or $500,000.

During the call, Salvatierra asked Mrs. Olivio to send her medical documentation of Mr. Olivio's injuries. Mrs. Olivio asked Salvatierra if Southern-Owners was going to accept 100 percent responsibility for the accident and Salvatierra responded "no, not at this time, that is under investigation." Deposition of Mrs. Olivio at 39: 2-3.

Salvatierra's contemporaneous written notes of the conversation state, in relevant part: "[r]egarding CVD's injuries, she stated that her husband's right leg will need some reconstructive surgery. Mr. Olivio is a 56 year old man occupation mailman - post office. Mr. Olivio is in the hospital." Dkt. 38-4.

On January 24, 2007, Salvatierra received a telephone call from Janet, a paralegal at Michael Walker's law office, informing her that Walker represented Mr. Olivio. Salvatierra requested from Walker's office confirmation of the extent and nature of Mr. Olivio's injuries sustained in the accident. Specifically, Salvatierra's contemporaneous notes describe the conversation as follows:

> EXPECTING REP LETTER [.] LEFT MESSAGE FOR ATTORNEY, NEED TO CONFIRM CVD INJURIES [.] SPOKE WITH PARALEGAL AND STATED THAT SHE DOES NOT HAVE ANY INFORMATION AS OF TODAY. SHE WILL HAVE ATTY CALL US BACK. REQUEST FROM HER JUST A CONFIRMATION OF CVD INJURIES TO TENDER LIMITS

Dkt. 33-3. That same day, Salvatierra received a letter from Walker's office, via facsimile, which requested disclosure of all liability insurance policies in effect for Machalette at the time of the accident. The letter did not state anything about Mr. Olivio's injuries.

On or about the same day, the Machalettes met with Salvatierra to pick up their property damage check because their vehicle had been declared a total loss. At that meeting,

Salvatierra confirmed she had spoken to Mrs. Olivio and understood Mr. Olivio had serious

injuries.  Salvatierra informed the Machalettes that Mr. Olivio's claim would most likely go

outside the policy limits.

That same day, Salvatierra also sent a letter to Machalette informing her about Mr.

Olivio's claims.  The letter stated, in part:

> As you are aware, Auto Owners Insurance Company[1] is in receipt of a claim
> wherein, Robert Olivio sustained injuries in an automobile accident on January
> 18, 2007.  The purpose of this letter is to advise you that while we will be
> making every attempt to settle his bodily injury claim within your policy limits
> of $100,000, he may have a claim that exceeds your bodily injury limits.
>
> While we will certainly attempt to settle this claim within your limits, you
> should be aware that if we are not successful, you could be liable for any
> judgments in excess of your coverage.

Dkt. 33-4.

On January 25, 2007, Southern-Owners sent a complete copy of Machalette's

insurance policy and documentation to Walker's office.  The cover letter to Walker stated,

in part: "Our investigation continues with regard to the incident in question.  Please provide

us with information regarding your client's injuries and/or property damage at your earliest

convenience."  Dkt. 33-5.

On February 2, 2007, Salvatierra received the police report regarding the accident

from the Florida Highway Patrol.  The police report indicated that the injury severity was a

4, which means "incapacitating."  Dkt. 33-2.  There were no additional details related to Mr.

---

[1] Auto Owners Insurance Company is the parent company of Southern-Owners.

Olivio's injuries. From the police report, Salvatierra obtained the name of a potential witness

to the accident and sent a request to the witness for a statement.

On or about February 3, 2007, Salvatierra made a follow-up telephone call to

Walker's office to request information concerning the extent of Mr. Olivio's injuries.

Salvatierra talked to Janet, Walker's paralegal, but received no additional information.

On February 28, 2007, Salvatierra received the witness statement that was requested

earlier in the month. The witness statement did not contain any information about the extent

of Mr. Olivio's injuries.

On March 9, 2007, Southern-Owners received medical bills for Machalette totaling

$14,291, which it paid under its PIP coverage. On March 15, 2007, Salvatierra generated a

report for Southern-Owners' corporate legal department summarizing the status of the case.

Salvatierra reported that Mrs. Olivio informed her that Mr. Olivio would require

reconstructive surgery and that his right knee and ankle were shattered. She then raised the

reserves to $100,000.

On March 20, 2007, Walker filed suit on behalf of Mr. Olivio against Machalette and

on March 27, 2007, Machalette was served with the summons and a copy of the complaint.

On March 28, 2007, Salvatierra received a copy of the summons and complaint and

forwarded the documents to Southern-Owners' legal department. Southern-Owners assigned

the case to attorney Kim Marie Murano. On at least two separate occasions after the

complaint was filed, Murano called and left messages for Walker. Murano's calls were not

returned.

On April 5, 2007, Murano served Mr. Olivio, through Walker, interrogatories and requests for production, requesting information and documents related to Mr. Olivio's injuries and damages arising from the accident. On June 1, 2007, Murano sent a letter to Walker notifying him that the discovery responses were past due and requesting that he provide the requested information. On June 13, 2007, Murano filed a motion to compel discovery responses because she still had not received any information regarding Mr. Olivio's damages. The court in that case set the motion for a hearing on July 31, 2007.

On June 25, 2007, Murano received from Walker Mr. Olivio's responses to the interrogatories and requests for production. The production included medical bills totaling $128,533.63 for Mr. Olivio's injuries. Walker stated in his deposition that this was the first time he provided any information about Mr. Olivio's damages to Southern-Owners.

That same day, Murano drafted a letter to Salvatierra discussing Mr. Olivio's discovery responses and his damages in the amount of $128,533.63. Salvatierra received and reviewed the letter on June 26, 2007. The letter stated, in part: "By way of update, today I received the Plaintiffs' Answers to Interrogatories and Response to Request for Production. As this was the first information we have received regarding injuries and treatment, copies of the discovery responses are attached in their entirety." Dkt. 33-11. Based on this information, Salvatierra requested a policy-limits tender to Mr. Olivio.

On June 27, 2007, Southern-Owners tendered the full policy limits to Walker. The June 27, 2007 cover letter from Murano to Walker enclosed a check for $100,000 and stated, in part: "Due to the fact that several of my attempts to contact you after this lawsuit was

initiated went unanswered, these discovery responses contained the first reliable information

or documentation of your client's injuries and damages." Dkt. 33-12.

Murano, having received no response from Walker to her June 27, 2007 letter, sent

additional letters to Walker on August 9, 2007 and August 24, 2007, regarding the pending

settlement check in the amount of $100,000.

On September 5, 2007, Walker sent a letter to Murano rejecting Southern-Owners'

tender of the full policy limits. After receipt of Walker's rejection letter, Murano transferred

representation of Machalette to outside counsel, Mike Rywant. Thereafter, Machalette

negotiated a consent judgment with the Olivios in which she consented to a judgment against

her for $1,000,000. Southern-Owners then paid the $100,000 policy limits toward

satisfaction of the judgment against Machalette.

On February 10, 2010, Machalette initiated this bad-faith action against Southern-

Owners in state court. The case was then removed to this Court on March 9, 2010.

## DISCUSSION

### I.     Summary Judgment Standard

Motions for summary judgment should be granted only when the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

show there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). The existence of some factual disputes between the litigants will not defeat

an otherwise properly supported summary judgment motion; "the requirement is that there

be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *Anderson*,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## II.    Southern-Owners' Motion for Summary Judgment

Southern-Owners argues that summary judgment should be granted in its favor because the undisputed record evidence reflects that Southern-Owners acted in good faith and that the delay in the settlement of Mr. Olivio's claim was caused by Walker's refusal to provide any verification of Mr. Olivio's injuries. The Court agrees and concludes that Southern-Owners complied with the duties and obligations imposed by Florida law.

"Under Florida law, an insurer has a fiduciary relationship with its insured and is therefore obligated to 'investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.'" *Ahoy v. State Farm Mut. Auto. Ins. Co.*, 09-CV-21400-CIV, 2010 WL 727967, at *1 (S.D. Fla. Jan. 5, 2010), *aff'd*, 394 F. App'x 655 (11th Cir. 2010) (*quoting Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). Courts may resolve bad-faith claims as a matter of law if the undisputed facts are such that no jury could conclude the insurer acted in bad faith. *Id.*

The crux of this case is whether Southern-Owners unreasonably or willfully delayed offering Mr. Olivio the $100,000 policy limit. In a case such as this one, where the claimant (Mr. Olivio) does not make a settlement demand, the insurer has an affirmative duty to initiate settlement negotiations "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991). Southern-Owners concedes that within days of the accident, it knew its insured was entirely at fault for causing the accident. Thus, this case

turns on the issue of whether Southern-Owners had knowledge that Mr. Olivio's injuries were so serious that a judgment in excess of the policy limits was likely.

Here, the record is undisputed that Southern-Owners acted reasonably under the circumstances because it did not have reliable information about Mr. Olivio's injuries and went to great lengths to obtain verification of his damages. Five days after the accident, Southern-Owners asked Mrs. Olivio to send medical documentation of Mr. Olivio's injuries. The next day, Southern-Owners learned from Walker's office that Mr. Olivio retained Walker to represent him with respect to his claim against Machalette. Thus, Southern-Owners could no longer communicate directly with the Olivios to receive Mr. Olivio's medical documentation. However, as soon as Southern-Owners learned of Walkers' representation, it requested from Walker's office verification of Mr. Olivio's damages and injuries. Salvatierra's contemporaneous notes of her January 24, 2007 conversation with Janet, a paralegal in Walker's office, state, in relevant part: "spoke with paralegal and stated that she does not have any information as of today, she will have atty call us back. request from her just a confirmation of CVD injuries to tender limits."

The record is undisputed that Walker did not provide the necessary information for more than five months, despite Southern-Owners' numerous requests for same. The record is undisputed that Southern-Owners attempted to verify Mr. Olivio's damages with Walker on eight separate occasions. The undisputed facts also reflect that when the information was provided (after the attorney representing Machalette in the underlying action filed a motion to compel the information and the court set the matter for hearing) and Southern-Owners was

able to verify the extent of Mr. Olivio's injuries, it tendered a check for $100,000, the policy

limit, within forty-eight hours.  No reasonable jury could find a bad faith dereliction of duty

under these circumstances.

Plaintiff attempts to defeat summary judgment by arguing that the record reflects that

Southern-Owners should have tendered the $100,000 earlier because it had pre-suit

information that Mr. Olivio's injuries were so serious that a judgment in excess of the policy

limits was likely.  Plaintiff points to three sources of information describing Mr. Olivio's

injuries: (1) a conversation with Mr. Machalette on the day of the accident, in which he

described the injury as "pretty serious;" (2) Salvatierra's conversation with Mrs. Olivio five

days after the accident, where Mrs. Olivio stated that Mr. Olivio was in the hospital, would

not be out any time soon, had prior surgery, and would need future reconstructive surgery;

and (3) the police report, received fifteen days post accident, which described Mr. Olivio's

injury as "incapacitating" and noted that Mr. Olivio was taken to the hospital by EMS.

This record evidence, however, does not establish that Mr. Olivio's injuries were so

serious that a judgment in excess of $110,000 (the coverage amount plus the statutory setoff)

was likely.  Mrs. Olivio stated in her deposition that, at the time she spoke to Salvatierra five

days after the accident, she did not know whether Mr. Olivio's damages would amount to

$5,000 or $500,000.  This is just one example of the uncertainty of Mr. Olivio's damages at

that time.  The police report and two-word description by Mr. Machalette (who received his

information second-hand from Mrs. Machalette) also provided no insight into the degree of

Mr. Olivio's injuries.  And, even though it is clear that Salvatierra knew that Machalette was

at fault for the accident and Mr. Olivio had suffered some amount of damage, the record does not reflect any facts suggesting that this damages amount was likely to exceed $110,000. In other words, one would have to speculate on Mr. Olivio's injury and the amount of his hospital bills.

Plaintiff also argues extensively that the January 24, 2007 "excess letter" Salvatierra sent to Machalette and the related conversation that occurred on that same day between Salvatierra and the Machalettes are evidence that Southern-Owners knew Mr. Olivio's damages were likely to exceed $110,000. This argument is without merit: As Southern-Owners points out, this letter does not change the facts that were known to Southern-Owners at the time, nor does it increase or decrease the likelihood that Mr. Olivio's claim would exceed the policy limits. Indeed, at the time the letter was written, all that was known to Southern-Owners was what Mr. Machalette told Salvatierra, second-hand, and Mrs. Olivio's description of Mr. Olivio's injuries. No reasonable jury could find that this letter, and the corresponding conversation with Machalette regarding the possibility of excess damages, required Southern-Owners to abandon its attempts to verify the extent of Mr. Olivio's damages and immediately write a $100,000 check to him.

In fact, such a ruling would place insurance companies in an untenable position. Florida law is clear that an insurance company has a good-faith duty to put the insured on notice of her possible exposure to an excess judgment. *See Barnard v. Geico Gen. Ins. Co.*, No. 5:10CV213/RS-CJK, 2011 WL 2039560, at *3 (N.D. Fla. May 25, 2011) (recognizing that "good faith duty obligates the insurer . . . to warn [the insured] of the possibility of an

excess judgment"). If the Court were to rule that the January 24, 2007 letter to Machalette in this case was sufficient evidence of Southern-Owners' knowledge that Mr. Olivio's damages most likely exceeded the policy limits, it would make it impossible for insurance companies to comply with the good-faith duty to put their insureds on notice of possible exposure to an excess judgment, without accepting responsibility to pay the third-party claimant the policy limits at that time.

Accordingly, the Court concludes that Southern-Owners is entitled to summary judgment as a matter of law.

It is therefore ORDERED AND ADJUDGED that:

1.    Defendant Southern-Owners Insurance Company's Motion for Summary Judgment (Dkt. 33) is hereby GRANTED.

2.    The Clerk is directed to enter final summary judgment in favor of Defendant Southern-Owners Insurance Company and against Plaintiff Lynda Machalette.

3.    The Clerk is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on August 23, 2011.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2010\10-cv-600.msj33.frm